**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**MELINDA YPARREA and AMERICANA PRODUCTS**
**COMPANY, INC, d/b/a AMERICAN PRODUCTS**
**COMPANY, INC.; and MELINDA YPARREA, Individually**          **PLAINTIFFS**

**v.**          **CIVIL ACTION NO. 5:07-cv-05152-RTD**

**WAL-MART STORES, INC**          **DEFENDANT**

---

**FIRST AMENDED COMPLAINT**

---

**JURY TRIAL REQUESTED**

Melinda Yparrea and Americana Products Company, Inc., together d/b/a/ American Products, and Melinda Yparrea individually, state the following as their claims against the Defendant, Wal-Mart Stores, Inc. ("Wal-Mart"):

PARTIES

1.       Americana Products Company, Inc. is a Florida corporation which had its place of business in Santa Rosa County, Florida.  It is an S corporation owned by Melinda Yparrea.  Ms. Yparrea and Americana did business as a single enterprise and were recognized by Wal-Mart in the name of "American Products".  They are together referenced herein as "Plaintiff" or "American Products".

2.       Plaintiff Melinda Yparrea is a resident of Fairhope, Alabama.  She asserts, individually, specified claims that arise out of the same transactions or occurrence as the claims of American Products.  She is referred to herein as "Plaintiff Yparrea".

3.      The Defendant, Wal-Mart, is a Delaware corporation with its principal place of business in Arkansas.

4.      Wal-Mart operates numerous stores in Arkansas and in this District.  This case has been previously transferred to this District.

SUBJECT MATTER JURISDICTION

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has jurisdiction over this matter based upon 28 U.S.C. § 1338(a), as this matter involves claims arising under Acts of Congress relating to copyrights, specifically 17 U.S.C. § 101, *et seq.*

6.      The court has personal jurisdiction over Wal-Mart, and venue is proper in this district.

7.      The claims asserted by Plaintiff American Products and Plaintiff Yparrea arise out of the same transactions or occurrences.

FACTS

8.      In 2003, Plaintiff approached Wal-Mart about its purchasing for retail sale certain magnetic, flashing enamel pins offered by Plaintiff.

9.      In the summer of 2003, Wal-Mart made an initial "test order" of American Products' "everyday line" of pins.  Of these, five or six were standard or "non-descript" pin designs.  Two of these designs, however, were designed by American Products and were distinctive and unique.

10.     Multiple Wal-Mart store managers reported to American Products that these pins sold rapidly.

11.     However, a Wal-Mart corporate official, Clifford Young, had told Plaintiff that the sales had not gone well.  But, when confronted with the store managers' statements, he admitted he had not been telling the truth.

12.     Next, in response to the rapid and large initial sales, Wal-Mart wanted pins from Plaintiff with holiday designs—e.g., Christmas, Valentines and Easter—as well as other designs (e.g. NASCAR).

13.     To meet this request, Plaintiff accelerated its design of new pins.  American Products employed up to three artists at a time working on the design drawings for these pins. Plaintiff designed and perfected certain new and unique magnetic, flashing enamel pins.

14.     After refining the several distinctive designs, Plaintiff arranged to have the pins manufactured in China.

15.     All of the pins that were designed by Plaintiff, and sold by Plaintiff to Wal-Mart, contained the copyright symbol (©), indicating that they were distinctive, copyrightable and copyrighted.  These included all of Plaintiff's holiday designs, plus a musical note design and parrot design that had been included in Wal-Mart's original order.

16.     All of the pins that were designed by American Products were distinctive and protected as the proprietary and copyrighted product of American Products.

17.     Moreover, the display stand utilized by Plaintiff to hold and display its product in the store was designed by Plaintiff, was distinctive, and was unique in the United States and Wal-Mart.  The display stand was unique in that the entire top of the display lit up with an assortment of flashing strobe light pins that flashed permanently.  The display was distinctive and protected as the proprietary and copyrighted product of American Products.

18.     After Wal-Mart made its second set of orders, Plaintiff had the newly designed pins manufactured, and Plaintiff shipped the ordered pins to the ordering or specified Wal-Mart stores.

19.     These pins also sold rapidly, and the individual stores were calling American Products and making order after order to meet demand.

20.     The pins designed and sold by Plaintiff had distinctive and attractive designs and the pin displays (sent with the product to be used in the stores) were the first strobe-light-flashing displays utilized for such product displays by Wal-Mart.  Moreover, the Plaintiff was selling the product to Wal-Mart prices at the invoice price of $1.15-$1.24 per pin, and Wal-Mart was reselling the pins for $1.84-$1.97 each; these were far below the costs and price at which Wal-Mart was offering plain, non-flashing enamel pins.

21.     Wal-Mart's sale of the American Products pins continued to go extremely well. Wal-Mart and its individual stores placed initial orders; then reordered; then reordered again; then reordered again.  Over 95% of all of the individual Wal-Mart orders were placed directly by the individual stores, and all shipments by Plaintiff were made directly to the individual stores (or occasionally to one of Wal-Mart's many distribution centers).

22.     In 2003 and 2004 Wal-Mart had advised Plaintiff that the Wal-Mart stores could order pins directly from American Products.

23.     Local Wal-Mart stores that ordered the pins from American Products included those in Brandon and Clinton, Mississippi.  Others included other Wal-Mart stores in other parts of the Southern District of Mississippi (Newton, Laurel, Waynesboro and Pascagoula), and in the Northern District of Mississippi (Corinth, Starkville, Booneville, Louisville, Greenville).

24.     In about June 2003, Wal-Mart gave American Products a vendor number, and many weeks later sent American Products a vendor supplier package.

25.     In summer 2003, Wal-Mart told American Products to purchase an electronic system, for which American Products paid almost $40,000, in order that American Products could (a) be paid electronically, (b) observe and keep up with in-store sales, and (c) be able to service the stores so that they would not run out of product.

26.     An arrangement that Wal-Mart has with some suppliers, but did not have with the Plaintiff, was that the vendor's products sales to Wal-Mart would be "guaranteed sales", meaning that anytime Wal-Mart could not sell the product, it could return it to the vendor for a credit.  Wal-Mart never had this agreement with the Plaintiff, who refused to guarantee all sales and indicated to Wal-Mart at every point that Plaintiff did not have such a "guaranteed sales" agreement.

27.     The 2003 sales of the Plaintiff's Christmas products in Wal-Mart stores were exceptional.  The pins flew off the shelves.  Wal-Mart stores—the managers, co-managers and assistant managers—were calling American Products to order products.

28.     Plaintiff is informed and believes that the sales of its pins in Wal-Mart stores before Christmas in 2003 surpassed the sales of any such previous Wal-Mart sales of enamel pins for similar (or even longer) period.

29.     After Christmas, a Wal-Mart representative advised Plaintiff that he had bought a great deal from them and that he wanted some money back.  The demand was, in the best light for Wal-Mart, an improper and unlawful attempt to re-negotiate a product price after order and purchase by Wal-Mart, shipment to Wal-Mart, and re-sale by Wal-Mart.

30.     At this time, Wal-Mart had not paid Plaintiff for substantial amounts of Plaintiff's product that had already been ordered, purchased, delivered and probably sold.  Plaintiff would not agree to make such a "payment" or post-sales change in sales price.

31.     To force Plaintiff to accede to Wal-Mart's demands, a Wal-Mart representative put a freeze on Wal-Mart's purchases of pins from American Products.

32.     Then, in the spring of 2004, following the debut of the movie, *The Passion of the Christ*, a Wal-Mart official asked Plaintiff if they could supply strobe-lighted enamel pin crosses. Plaintiff said it could.  The Wal-Mart official said he wanted the shipment of these crosses rushed, and he lifted the freeze on purchases from American Products.  The Wal-Mart official said that, if American Products would make and ship the new product, Wal-Mart would pay the substantial amount of over-due invoices.

33.     At about that time, Wal-Mart issued the purchase order numbers not only for these crosses, but also for Easter, NASCAR, and other distinctive designs.

34.     In reliance upon Wal-Mart's representations, Plaintiff had these pins designed, manufactured, and prepared for shipment to Wal-Mart.

35.     Wal-Mart representatives again told Plaintiff that the individual Wal-Mart stores could order all of these American Product pins they wanted.  Wal-Mart representatives invited Plaintiff to contact the individual Wal-Mart stores for orders and on a number of occasions (before and after the end of March 2004) Wal-Mart representatives would instruct Plaintiff to call the stores directly and said the stores could order whatever product they wanted.

36.     In August 2004, Wal-Mart held its Holiday Show in Dallas, Texas.  This show was for only the highest-selling vendors to Wal-Mart.  Plaintiff was invited to this show, and Wal-Mart said that it wanted pin displays from Plaintiff for the show, to show the individual

Wal-Mart store managers what was available for them to order and sell.  Wal-Mart had Plaintiff send several displays to the show.

37.    In 2004 (except for a short period in late March and early April), Plaintiff called the individual stores, as Wal-Mart repeatedly directed.  Plaintiff looked at what the stores had ordered before Christmas in 2003 and advised them of these numbers.  Plaintiff received substantial orders from the individual Wal-Mart stores.

38.    Then, curiously, beginning at about the end of September 2004, certain Wal-Mart stores shipped back to Plaintiff some of the product that those stores had ordered and received.

39.    Wal-Mart had no right to return such ordered and purchased product.

40.    All or almost all of the stores simply kept and sold their pins but never paid Plaintiff for them.

41.    Upon investigation, Plaintiff determined that Wal-Mart was selling, in many of its stores, blatantly "knock-off" copies of Plaintiff's copyrighted pins, in place of Plaintiff's pins. Moreover, Wal-Mart was using a copy of Plaintiff's distinctive displays in its stores to hold, display and sell its copied products.  Wal-Mart had carried out its threat to copy and sell Plaintiff's product.

42.    On several occasions, a Wal-Mart representative, Clifford Young, had told Plaintiff that he (Wal-Mart) could avoid buying from American Products while still having the same product for sale by simply copying Plaintiff's designs and products and arranging for their manufacture in China.  Plaintiff had told him he was not allowed to do that.

43.    Wal-Mart stores were packed with the copied "knock-off" product.

44.    Defendant Wal-Mart's copies or "knock-offs" of Plaintiff's product sold well, and Wal-Mart used these sales to displace sales of Plaintiff's product.

45.     After a time, Wal-Mart stopped selling its copies of Plaintiff's pins.  On information and belief, Wal-Mart did so because it realized or was advised it was violating Plaintiff's copyright.

46.     Wal-Mart authorizes individual Wal-Mart stores to order product from Wal-Mart vendors and provides the stores with purchase order books to do so.  At one point, on March 30, 2004, a Wal-Mart representative requested by email that Plaintiff not call on the local stores. However, later, Wal-Mart again authorized individual stores to buy what they wanted from Plaintiff (and even provided Plaintiff store numbers to call for orders), told Plaintiff the stores could order and buy directly from Plaintiff, and has paid for a number of such individual store purchases.

47.     Over a period of approximately one and a half years, Wal-Mart ordered and purchased a total of approximately $4,500,000.00 of pins from Plaintiff.  Wal-Mart paid for approximately $3,300,000.00 of the pins.  Wal-Mart did not pay for approximately $1,250,331.53 of these pins.

48.     On December 27, 2004, a Wal-Mart representative sent an email to all of its stores in the United States (about 2000 stores) and thousands of employees (managers, co-managers, assistant managers and others) that falsely accused Plaintiff of dishonesty.  The email untruthfully claimed that Plaintiff had made false statements to store representatives.

49.     When Wal-Mart wrongfully refused to pay amounts it owed to Plaintiff, Plaintiff suffered business interruption and losses.  Ultimately, Plaintiff American Products was forced out of business, and it had to sell its building at a price far below its value.

UNPAID INVOICES AND IMPROPER CREDITS

50.     Wal-Mart, through its stores or, in some cases, its central office in Arkansas, placed orders for and was sent invoices totaling approximately $4,500,000.00.  Of this amount, Wal-Mart paid invoices totaling approximately $3,300,000.00.

51.     Wal-Mart has not paid for $1,250,331.53 in invoices.

52.     These unpaid invoices, totaling $1,250,331.53, included invoices from 2003 and 2004, and the amount owed on the open account has increased since then by the amount of lawful interest at the applicable annual rate.  The past due invoices may be broken down in the following categories:

a.     $22,954.00—Invoices from 2003 (for which Wal-Mart has not also taken an improper credit).

b.     $560,708.60—Invoices from 2004 (for which Wal-Mart has not also taken an improper credit).

c.     $666,668.84—Additional invoices in 2003 and 2004 for which Wal-Mart also have taken improper credits against amounts owed to Plaintiff.

53.     The $666,668.84 in improper credits falls into two categories:

a.     Instructed by Wal-Mart management, some Wal-Mart stores returned pins to Plaintiff (when Wal-Mart began selling its own copied product in some of the stores in 2004), which they had no right to do.  Wal-Mart and these stores improperly took credits against the amount owed Plaintiff for these returns.  Plaintiff previously has offered to return to Defendant the improperly returned pins, and Plaintiff hereby tenders that product to Wal-Mart.

b.     Many of these improper credits were even more outrageous because the ordering stores kept the delivered pins from Plaintiff, never paid Plaintiff for the pins, and still took credit

against Plaintiff's account for the amount (or more) of these orders. Thus, these stores ordered product from Plaintiff, received the product, never paid for the product, and presumably resold the product, but were charging Plaintiff for the product.

54. Plaintiff has made numerous written demands of Wal-Mart, setting forth the amount owed on an open account and providing an itemized statement of the account, including the following:

a. In December 2004, Plaintiff gave the invoices and itemized statements to a senior vice president of Defendant.

b. In January 2005, Plaintiff gave a full set of all outstanding invoices and statement of amounts owed to an in-house attorney for Defendant.

c. Later in January 2005, Plaintiff sent another set of outstanding invoices to P.K. Holmes, outside counsel for Defendant.

d. In March 2005, Plaintiff gave another set of this full accounting information to another outside counsel for Wal-Mart.

e. In April 2005, when Plaintiff received notice from Defendant that Defendant recognized that it owed money to Plaintiff and asked for further account information, Plaintiff again provided a full set of this information and documentation to Defendant.

f. At a mediation in May 2005, Plaintiff had the same information available for Defendant, and Plaintiff gave Defendant updated information on additional expenses incurred.

g. In 2004, Plaintiff provided an additional set of documentation of amounts owed to personnel (at their request) in Wal-Mart's Accounts Receivable/Payable Department (Post-Audit).

h.      On several other occasions, including November 2005, counsel representing Plaintiff have demanded payment of the open account.

55.      Attached to this Complaint are:

Exhibit A:  a sample invoice of the type sent to Defendant for each order and shipment (together with proof of delivery); and

Exhibit B:  a compilation of the unpaid invoices and improper credit.

56.      On several occasions, Defendant's personnel have acknowledged that they owed to Plaintiff the money claimed and said that they would put the items in line for payment. However, the payment has never been made.

PATTERN AND PRACTICE

57.      On information and belief, Wal-Mart's treatment of Plaintiff American Products—ordering, promising, trying to renegotiate post-sale, failing to pay, threatening to drive or actually driving companies out of business—is typical of its treatment of smaller vendors such as Plaintiff.

OTHER DAMAGES

58.      Because of Defendant's counsel, Plaintiff went to great expense in contacting the individual stores to determine why they were not paying for the product of Plaintiff that they had ordered and received.  Plaintiff also incurred substantial expense in contacting, meeting and dealing with representative of Wal-Mart in the Arkansas headquarters on this same subject. These efforts also took time away from Plaintiff's efforts to develop other business and customers.  Plaintiff made numerous copies of all of the outstanding invoices, and tabulations and summaries of the same, and provided them to Defendant on numerous occasions.

59.     These expenses were multiplied because Defendant or the individual stores on numerous occasions would say they were going to pay the outstanding amounts, or put them in line for payment, and then those stores or Wal-Mart headquarters would not make payment as promised.

60.     Plaintiff incurred substantial accounting, legal, copy and transportation expenses in making repeated demands on and presentations to the Defendant, none of which would have been necessary if Defendant had paid its open account or honored its contractual obligation.

61.     Plaintiff has suffered loss of approximately $40,000 for the loss of value or use of the electronic system it purchased, at Defendant Wal-Mart's insistence, in order to do business with Wal-Mart.

62.     In addition to the amount owed by Defendant on the unpaid invoices, including improperly taken credits, Wal-Mart is responsible for other injury to Plaintiff that was caused, directly and foreseeably, by Defendant's conduct.

63.     Because Plaintiff had distinctively designed an innovative product, it had significant sales in its first years of operation.  These significant sales would reasonably have continued and increased, but for Defendant's conduct and failure to pay.  Defendant is responsible and liable for this loss of future profits, in an amount to be determined at trial.

64.     Defendant's withholding of payments due to Plaintiff American Products, coupled with Defendant's making further orders and promising future business, put Plaintiff in a position of not being able to pay its vendors or employees.  Despite the efforts of Plaintiff American Products and Plaintiff Yparrea, and Plaintiff Yparrea's even taking out a personal loan on her home to put into the business, Plaintiff American Products was driven out of business.

65.     As a result of the destruction of Plaintiff's business, Plaintiff has lost the future profits that were reasonably obtained if Plaintiff could have remained in business.

66.     The failure of Plaintiff's business was the result solely of Defendant's conduct and actions.

67.     As a result of being forced out of business, Plaintiff American Products was forced to sell its building much sooner than would otherwise have been expected, and at a price far below the appraised value of the building.  This forced sale was the direct result of Defendant's conduct and actions that drove Plaintiff American Products out of business.

68.     As a result of Defendant's conduct, both Plaintiff American Products and Plaintiff Yparrea have suffered loss of business goodwill and injury to business reputation.

69.     Plaintiff Yparrea took out a loan, secured by a mortgage on her personal residence, to provide funding for American Products while it waited to be paid by Defendant. This loan was taken out based upon the amounts Wal-Mart owed and had in fact agreed on several occasions to pay.  Because Wal-Mart did not pay its contractual obligations as promised, American Products was forced out of business and Plaintiff Yparrea lost the additional money put into the business.

70.     As a direct result of Defendant's conduct, as alleged, Plaintiff Yparrea suffered physical and mental injury, mental suffering, and anxiety.  This injury continues.

71.     Plaintiff American Products is entitled to punitive damages as a result of Plaintiff's conduct as alleged.

## **CLAIMS**

### **COUNT I:**
OPEN ACCOUNT:  UNPAID INVOICES

72.     Plaintiff reasserts the allegations above.

73.     Plaintiff is entitled to recover from the Defendant, Wal-Mart, the amount of its open account, $1,250,331.53, plus applicable interest at the legal rate.

74.     Plaintiff is entitled to recover from the Defendant, Wal-Mart, Plaintiff's attorney's fees under the applicable open account statute(s).

## COUNT II:
CONTRACT CLAIM

75.     Plaintiff reasserts the allegations above.

76.     The product sold to Wal-Mart, and for which Wal-Mart has not paid, was sold pursuant to valid purchase orders and invoices that constituted contracts between the parties.

77.     For each order, Wal-Mart or the individual stores gave Plaintiff a distinct purchase order number for the order, and Plaintiff incorporated this purchase order number and referenced it in the invoices.

78.     Wal-Mart has breached its contracts to pay for the products ordered and received from the Plaintiff.

79.     Plaintiff has been injured by Defendant's breach of its contracts.  This injury is the amount that Wal-Mart has not paid on the outstanding invoices (including the improper credits Wal-Mart has taken), the loss for the destruction of Plaintiff's business, lost future profits, loss on forced sale of Plaintiff's building, and other losses resulting directly from Defendant's conduct as alleged.

## COUNT III:
UNJUST ENRICHMENT

80.     Plaintiff reasserts the allegations above.

81.     Defendant Wal-Mart has been unjustly enriched.  Wal-Mart stores received pins from Plaintiffs on valid purchase orders, never paid Plaintiff for the pins, sold the pins and then even took a credit for pins it had not paid for and had sold.

82.     Wal-Mart has been unable to produce documentation concerning all American Products pins that were sold to its customers and other entities.

83.     Wal-Mart's actions have injured Plaintiffs in the amount of the unpaid invoices (including the improper credits Wal-Mart has taken), the destruction of Plaintiffs' business, lost profits, and other losses directly related to Wal-Mart's actions.

### COUNT IV:
FRAUDULENT MISREPRENSTATION

84.     Plaintiff reasserts the allegations above.

85.     On several occasions, an authorized Wal-Mart representative, Clifford Young, made false statement, or statements that he knew or intended were not true, to Plaintiff.  Wal-Mart intended for Plaintiff to rely upon these statements; Plaintiff did rely upon the statements, to its detriment.

86.     For example, Mr. Clifford Young, on behalf of Wal-Mart, promised to American Products orders for all holidays if American Products would "help him out" by taking back $20,000 worth of Christmas pins.  Young made this request to American Products while acknowledging that American Products had never agreed to a guaranteed sales arrangement. American Products let Wal-Mart ship back product on this one occasion, in reliance upon this representation, but Young and Wal-Mart never gave Plaintiff the promised purchase orders.

87.     On other occasions, Clifford, as an agent of Wal-Mart, told American Products that if it would ship new product, Wal-Mart would pay the still-outstanding past-due invoices

and would give American Products new invoices.  Again, Plaintiff relied upon these statements

to its detriment.  Wal-Mart did not pay the past-due invoices.  Plaintiff is informed and believes

that Clifford knew his representation were false when he made them.

88.     As a result of Defendant's misrepresentations, Plaintiff suffered substantial injury,

including (without limitation) the loss of the amounts owed but not paid by Defendant, the

destruction of Plaintiff's business, the loss of future profits of Plaintiff's business, and the loss on

the forced sales of Plaintiff's building at a price below its value.

89.     As a result of Defendant's misrepresentations, Plaintiff Yparrea has been injured

and damaged monetarily, in the amount of the loan she took out to fund Plaintiff American

Product's operations.

90.     Defendant is liable for these injuries and damages.

91.     As a result of its misrepresentations, Defendant is also liable to Plaintiff for

punitive damages in an amount to be determined at trial.

**COUNT V:**
DECEPTIVE TRADE PRACTICE ARK. CODE ANN § 4-88-101 *et sq*

92.     Plaintiff reasserts the allegations above.

93.     Wal-Mart's actions and the actions of its employees constitute a deceptive trade

practice.

94.     Ark. Code Ann § 4-88-107 makes unlawful "engaging in any unconscionable,

false, or deceptive act or practice in business, commerce, or trade".

95.     Wal-Mart's actions and the dealing with American Products represents

unconscionable, false, or deceptive acts or practices in business.

96.     As a result of Wal-Mart's actions, Plaintiff suffered actual damages as laid out in

this Complaint and Plaintiff is entitled to those damages and attorney's fees.

16

## COUNT VI:
COPYRIGHT INFRINGEMENT

97.     Plaintiff reasserts the allegations above.

98.     This is a claim for copyright infringement, under 17 U.S.C. § 101, *et seq.*, for which Plaintiff seeks recovery of money damages and injunctive relief.

99.     The Defendant has manufactured, caused to be manufactured, prepared, caused to be prepared, distributed, caused to be distributed, sold and/or caused to be sold, certain enamel pins which are identical to, substantially similar to, and/or derivative works based upon the distinctive and copyrighted pins of Plaintiff American Products.

100.    At all relevant times, and before Wal-Mart caused to be made and sold its infringing pins beginning in 2004, Plaintiff had a copyright in these pins that it designed.

101.    Plaintiff has applied for registration of its copyrights, and the registrations will cover the entire period when Wal-Mart first saw, caused to be copied, caused to be manufactured, distributed and sold its infringing copies of Plaintiff's pins.

102.    The Defendant's acts of infringement, including without limitation the acts of copying, manufacturing, distributing, and selling the product described above, were not authorized by Plaintiff American Products.  These violations of Plaintiff's copyright occurred in numerous locations.

103.    The above-described actions of the Defendant, Wal-Mart, constitute copyright infringement, in violation of 17 U.S.C. § 101, *et seq.* for which Defendant is liable to Plaintiff American Products.

104.    The acts of the Defendant described above involved deliberate, intentional, and willful copying of Plaintiff's copyrighted works, with the knowledge that the copyrights in and to said copyrighted designs belonged to and/or were claimed by Plaintiff American Products.

105.    As a result of the above-described acts of Defendant, Plaintiff American Products has suffered monetary damages, including loss of profits, loss of business opportunities, loss of future profits, loss of business goodwill, injury to business reputation, and cost and expenses.

106.    As a result of the above described acts of Defendant, Defendant has made profits to which it is not equitably or legally entitled.

107.    Plaintiff American Products has suffered or will suffer irreparable damages unless Defendant is restrained by this Court.

108.    It will be extremely difficult to determine the amount of compensation which would provide American Products with adequate relief if Defendant Wal-Mart is not restrained from future violations.

109.    As a consequence of Defendant's acts in violation of the copyright laws, Plaintiff American Products is entitled the following remedies:

a.      injunctive relief against Defendant pursuant to 17 U.S.C. § 502;

b.      impoundment, surrender and/or destruction of all infringing products and all plates, molds, masters and other means by which such infringing products may be reproduced, pursuant to 17 U.S.C. § 503;

c.      recovery of monetary damages against the Defendant, *in solito,* by consisting of American Products' actual damages and any additional profits of the Defendant, or statutory damages; and

d.      recovery of Plaintiff's costs and attorney's fees.

## COUNT VII:
### LIABLE AND SLANDER OF PLAINTIFF AMERICAN PRODUCTS AND PLAINTIFF YPARREA

110.    Plaintiffs reassert the above allegations

111.    By its December 27, 2004 emails alleged above, Wal-Mart published to all of its stores and management a statement accusing Plaintiff American Products and Plaintiff Yparrea of dishonesty.

112.    Plaintiff American Products and Plaintiff Yparrea are informed and believe the email would have gone to the managers, co-managers, assistance managers and others in over 2,000 (and perhaps close to 2,500) Wal-Mart stores around the country.  These Plaintiffs do not know what other and similar defamatory emails or letters or statements Wal-Mart has circulated or made, or to whom.

113.    Defendant has liabled and slandered Plaintiff American Products and Plaintiff Yparrea, injuring their reputations, business reputations, reputations for honesty, and business goodwill.

114.    Each of these Plaintiffs is entitled to recovery in an amount to be determined at trial.

RELIEF REQUESTED

WHEREFORE, Plaintiff American Products and Plaintiff Yparrea request the Court to enter judgment in their favor as follows:

(a)    Award to American Products the open account balance at Wal-Mart, $1,250,331.53, plus interest from the date of each invoice to the date of judgment at the applicable legal rate;

(b)    Award to Plaintiff American Products its attorney's fees under the applicable open account statute or statutes;

(c)    Award to Plaintiff American Products its Other Damages resulting from Defendant Wal-Mart's conduct in an amount to be determined at trial;

(d)     Award to Plaintiff American Products its damages, statutory and otherwise, for

         Defendant Wal-Mart's acts of copyright infringement;

(e)     Award to Plaintiff American Products a permanent injunction barring Defendant

         Wal-Mart's copying or using Plaintiff's copyrighted product designs;

(f)     Award to Plaintiff American Products its damages for liable, slander or business

         defamation;

(g)     Award to Plaintiff American Products and Plaintiff Yparrea damages for injury

         for liable, slander or business defamation;

(h)     Award to Plaintiff American Products punitive damages in an amount to be

         determined at trial;

(i)     Award to Plaintiff Yparrea punitive damages in an amount to be determined at

         trial; and

(j)     Award to either or both of the Plaintiffs such other relief as may be appropriate.


                    Respectfully Submitted,

                    McMath Woods, P.A.
                    711 West Third Street
                    Little Rock, AR 72201
                    Telephone (501) 396-5400

                    By: /s/ Will Bond

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

W. Asa Hutchinson, III
THE ASA HUTCHINSON LAW GROUP, PLC
World Trade Center
3300 Market Street, Suite 404
Rogers, AR 72758

Joel D. Johnson
WARNER, SMITH & HARRIS, PLC
400 Rogers Avenue
P.O. Box 1626
Fort Smith, AR  72902-1626

By:  /s/ Will Bond